FILED
2014 Sep-17  AM 09:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | |
|---|---|
| **TIFFINI BROWN**, ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **CV-12-BE-3954-S** |
| **CRST MALONE, INC.,** ] | |
| ] | |
| **Defendant.** ] | |
| ] | |

## <u>MEMORANDUM OPINION</u>

This matter—asserting retaliation and race and gender employment discrimination—is before the court on "Motion for Summary Judgment of Defendant CRST-Malone, Inc." (Doc. 23). The Plaintiff filed a response (doc. 30), the Defendant replied (doc. 32), and the Plaintiff filed supplemental authority (doc. 34-1); this motion has received thorough briefing. For the reasons stated in this Memorandum Opinion, the court FINDS that CRST's motion for summary judgment is due to be GRANTED in PART and DENIED in PART.

More specifically, the court DENIES the motion as to the claims in Count One for discrimination based on race and/or gender, brought pursuant to Title VII; GRANTS the motion as to the claims in Count One for hostile work environment based on race and/or gender; DENIES the motion as to the claims in Count Two for discrimination based on race, brought pursuant to § 1981; and GRANTS the motion as to the claims in Count Two for hostile work environment based on race, brought pursuant to § 1981; GRANTS the motion as to the claim for retaliation, brought pursuant to Title VII.

1

## I.  FACTS

The Defendant, CRST-Malone is a flat-bed trucking company with offices in Trussville, Alabama.  In January of 2011, CRST hired Plaintiff Tiffini Brown, an African American female, as a Safety Processor.  The month after hiring Brown, CRST hired Tobenna "TC" Chekwa, an African American male, as a Recruiter to find drivers for hire or lease.

In the position of Safety Processor, Brown was responsible for conducting driver safety checks—including checks on a driver's insurance, DOT citation and compliance history, and background—to determine if a prospective driver satisfied the company's qualification standards.  During her first seven months at CRST, Brown worked under two different white supervisors, received no disciplinary action, and was promoted to Team Leader for the Safety Processors.  In late August of 2011, Harry Kimball, a white male, took over the position of Director of Safety from Chuck Haffenden, a white male, and Kimball became Brown's direct supervisor.  A two-week overlap existed when both Haffenden and Kimball worked in the Trussville office, and Brown does not recall having any specific conversation with Haffenden during that period about Kimball's maltreatment of her.

Kimball began addressing Brown as "Trouble" in September of 2011, and their working relationship was indeed troubled.  Brown acknowledged that she did not take the moniker "Trouble" as having any racial or gender connotations.  A few weeks before the incident made the basis of this suit, and after Haffenden left the Trussville office, the working relationship between Brown and Kimball deteriorated when Brown told Kimball that a driver Kimball had approved did not fall within the hiring guidelines.  According to Brown, at this point, Kimball began ignoring her and stopped communicating with Brown directly, using Rolinda Golden, a

2

Safety Supervisor who was a white female, as an intermediary.  Golden confirms that Kimball communicated with Brown indirectly using Golden as a channel and that Brown would ask Golden to accompany her to Kimball's office when Brown needed to communicate with him.

However, both Golden and a black female co-worker, Vershaune Roscoe, stated that they did not recall Kimball treating Roscoe differently than other employees.  Roscoe testified that Kimball respected her in her position and treated black people the same as white people.  Even Brown, when asked whether Kimball treated Roscoe differently than he treated white employees, said, "I can't speak for her on that.  All I can speak on is what I experienced while I worked with Mr. Kimball."  (Brown dep. 41).  She acknowledged that she never saw Kimball interact with Roscoe in his office.

On Friday, October 7, 2011, Chekwa  complained to Kimball about an incident that occurred about 10:15 AM on the company's smoking dock involving Chekwa and Tiffini Brown.  The facts about the incident are largely undisputed.  A group of CRST employees—Chekwa, Brown, Michael Gibbons, Dustin Knowles and Sarah Lovell—were outside during a work break when Chekwa tossed a rock in Gibbons's direction.  Gibbons picked up the rock and tossed it either back at Chekwa or aside, but Brown, who had been standing two to three feet away from Gibbons and talking to him at the time of the "toss," saw nothing playful about the incident.  Rather, Brown became mad and upset, insisting that Chekwa had nearly hit her knee with the rock.  Brown later acknowledged that she did not know whether Chekwa intended to hit her and did not know whether he was throwing the rock toward her or toward Gibbons.

After he threw the rock, Brown asked Chekwa, who by then was standing three- to five-feet away from her, to back away, and she claimed that Chekwa failed to follow her instruction

but instead  "stood in front of me as if he were mocking me." (Brown statement dated 10/7/11; Doc. 24-1, at 50).   Chekwa was 6'3" tall and weighed 200 pounds compared to Brown, who was 5'4' and weighed 118 pounds.  The situation escalated as Brown began yelling for Erica Aaron, an African American female who was Recruiting Coordinator, to "get [Chekwa] out of my face." Brown told Aaron in front of the co-workers:  "you better get out here and get your boy T.C. or I'm gonna put my foot up his ass." (Doc. 23, at 9).   Brown acknowledges cursing at Chekwa, calling him a "mother-fucker," and stating something to the effect that she would stick her foot up his ass. (Invest. Form, doc. 24-1, at 53).   In the meantime, no dispute exists that Chekwa remained calm and tried to explain to Brown that he had never intended to throw the rock at her.

On the day of the incident, Kimball heard about the incident and immediately notified CRST's HR department about it.  Chekwa did not submit a formal complaint about the incident. Determining that the incident required investigation, one of the HR leadership—either Lisa Oetken, Employee Relations Manager, or Angela Stastny, HR director— promptly asked Kimball to obtain statements from Chekwa, Brown, and witnesses to the incident on the smoking dock.

Stastny testified, based on the dates of the statements received, that by the afternoon of October 7, HR had received statements from Chekwa; Brown; Shafton Reese, the interim Recruiting Supervisor; Michael Gibbons, a Recruiter who was one of the witnesses to the incident on the smoking dock; Dustin Knowles, another witness; and Golden.  Kimball did not ask Brown directly for a statement or speak to Brown directly about the incident, but relayed the request for her statement through Golden. Some of the employees provided their statements to Kimball to forward to HR and some sent their statements directly to HR.  The witness statements

4

indicate that no real dispute exists about the general facts surrounding the rock incident; all confirmed that the incident began when Chekwa tossed a rock in the area where Gibbons and Brown were standing and that Brown became irate and began cursing Chekwa.  Several witnesses recall her making the statement that she would put her foot up/in his ass.

On Monday, October 10, at the request of Golden, Lovell sent an email to Brown with a copy to Golden, giving her version of the October 7 incident.  This recounting supports Brown's statement that the rock Chekwa threw almost hit Brown and that Chekwa continued to stand about four feet from Brown after she repeatedly asked him to back off.  CRST did not provide this statement to the EEOC when Brown later filed an EEOC complaint.

In addition to receiving the witness statements as part of the investigation into the rock incident, Stastny and Oetken interviewed Chekwa and Brown in separate video conferences.  On Tuesday, October 11, 2011, Chekwa was interviewed.

On Monday, October 10, 2011, an accident occurred in the yard at CRST.  Brown, Kimball and two white employees, Brian Brown and Amanda Work, went outside to investigate the accident.  According to Tiffini Brown, Kimball conversed with Brian Brown and Work but ignored Tiffini Brown's statements and refused to speak with her.  Following this incident, which occurred the day before her own interview with HR, Brown sent an email to Stastny with a copy to Golden raising her concerns about Kimball's treatment of her.  It states as follows:

> Angie,
>
> I have some concerns that I would like to discuss with you.  I don't know what the issue Harry Kimball has with me but there is one.  Since his third day here and couple of time thereafter he called me "Trouble" don't know why or where it came from.  Over the past two weeks he has not said one word to me.  He speaks and converses with everyone else in the department and others but has

blatant disregard for me and my function in the department.

Last Monday there was an issue where he approved a driver that wasn't in hiring guidelines and I brought it to his attention he seemed to get upset by me bringing it to him.  After he instructed us to do so.  In no way was I trying to "call him to the carpet."  Afterwards I asked him if he wanted me to review driver MVR's for recruiting and he told me "no I will handle that."  That is one of my job duties and I have been doing since Chuck was here.  Since there is some animosity from him to me and it is making this hard for me to do my job.

Thursday I was standing in the recruiting department talking to a couple of people and he walked by me not a word and turned his body in a direction as if he was trying to avoid any contact with me.

Friday there was an incident with a recruiter and he made no attempts to hear from me what happened or make sure that I was ok.  To me he sided with the recruiter and all fingers were pointed at me and I did nothing wrong.  I don't understand it.

Today there was an accident on the yard involving two owner operators.  Brian, Amanda, and I were walking outside we meet [sic] Harry at the door.  We were walking out there and I was trying to talk to him about calling the police and he completely ignored me.  When we got around to the trucks he talked to Brian and Amanda (continued to ignore me) and I was trying to speak to him as well.  That really bothers me.

I feel as if he is out to terminate me for whatever reason he can seem necessary to find.  He doesn't discuss anything with me concerning the department or my team, he overlooks me or ignores my presence.  I know for sure that I have not wronged or disrespect [sic] him in any form or fashion.  Others in the department have noticed his attitude towards me. I feel like an odd ball and don't think its [sic] fair.

I have contemplated long & hard about discussing this with him but I am not comfortable speaking to him at all about my concerns.

I am not trying to stick my neck on the chopping block but I have been here since January and no one has had an issue with working with me.  I get along with everyone and perform my job effectively.  Chuck appointed me as a Team Leader because of my performance.  I am a professional and respect him the same.  I would like to resolve any issue if there is one because we do have to work together and he is my direct supervisor.

Have a wonderful day.

(Doc. 24-1, at 51, Ex. 6).

On Tuesday afternoon, October 11, 2011, Stastny responded to Brown's email and asked if she were available the next morning for a conference.

On Wednesday, October 12, 2011, Oetken and Stastny interviewed Brown by video-web conference at approximately 8:30 AM,  and Oetken took notes.  According to those notes, Brown started the interview by focusing on Kimball's treatment of her, explaining how Kimball, who had brought the rock incident to HR's attention, treated her differently than other employees.  She also reiterated matters discussed in her October 10 email, such as Kimball's recent refusal to communicate with her directly.  Brown stated to Oetken and Stastny that she felt Kimball and the recruiters discriminated against her and retaliated against her.  Brown tied her complaints of discrimination and retaliation to her actions of making recruiters stick to CRST hiring guidelines.  She explained that when the drivers recruited did not meet the standards, she would disqualify driver candidates, and when "she tells [recruiters] why the driver doesn't meet standards [ ] [t]hey blame her for not getting drivers [ ] hired." (Doc. 24-1, at 54).

In her deposition testimony, Brown elaborated on the claims she made to Stastny and Oetken on October 12 of discrimination and retaliation:

> [Brown]: And I told [Stastny], I said, I feel discriminated against.  I feel like I'm under attack for something that I did not do or I felt the need to protect myself, and I then told her, I said I feel like I'm being retaliated against because I do my job very well and they have the – they have an issue with me because they can't go against the guidelines.  I respect them; they don't respect me.
> [Q]: That's referring to recruiting?
> [Brown]: Yes.

(Doc. 24-1, at 84-85).  Brown reiterated that the basis of her claims of discrimination were the

issues with Harry Kimball that she had outlined in her October 10 email to Stastny.  Brown

acknowledged that she personally had never heard Kimball use a racially or sexually derogatory

term.

As far as any discussion regarding gender-based discrimination, in the investigation

interview, Brown stated that "she could allege sexual harassment.  She gets compliments that she

looks nice."  (Doc. 24-1, at 54).  However, when asked repeatedly in her deposition to state the

basis for her discrimination and retaliation claims, Brown did not mention those compliments

and also did not refer to them in her brief's statement of facts and argument.

When Brown and Oetken discussed the rock incident itself, Brown admitted using the "f"

word multiple times during the incident, including calling Chekwa a "mother-fucker," and

Brown acknowledged making the comment about wanting "to stick my foot up his ass."  (Doc.

29-25).  She also acknowledged that she could not say Chekwa intended to hit her with the rock

and could not say whether he threw the rock toward her or Gibbons; she simply knew that it

came close to hitting her.  Stastny testified that Chekwa had complained in his statement that

Brown referred to him as a monkey or Chewbacca, a large ape-like character from Star Wars, and

that Brown also treated him differently than other employees based on his color and national

origin.  The briefs' Statements of Facts reflect that Chekwa is African American but do not

reveal his national origin.  Although she admitted joking around with Chekwa in the past, Brown

denied ever referring to him as a monkey or Chewbacca.

Stastny solicited statements from employees in the recruiting department, either directly

or indirectly, about incidents in which Brown may have treated Chekwa unfairly or any

inappropriate comments that Brown made.  However, the HR department took no further action

8

regarding Brown's complaint against Kimball.

Based on the statements and interviews, CRST concluded that Brown had violated CRST's employment policy prohibiting threatening and disruptive behavior. In her deposition testimony, Stastny explained that "She was disruptive and boisterous, but the primary reason [for the termination] was threatening, threatening behavior due to that comment she admitted to [making:] 'I'm going to shove my foot up your ass.'" (Stastny Dep. Doc. 24-2, at 41, p. 157). The spreadsheet compiled by HR to show employee discipline reflects that "[Chekwa] accused [Brown] of racially discriminatory names." Stastny acknowledged that the discipline Brown received was for her threatening and boisterous behavior, not for calling Chekwa racially discriminatory names, and Stastny has no explanation for this "error" on the spreadsheet.

The identity of the decision maker in Brown's termination is in dispute. Although Stastny testified in her deposition that she made the decision alone, CRST advised the EEOC in two different documents that Jim Schommer, Director of Operations, was part of the decision making process, and CRST stated in an Interrogatory Answer that Schommer was the decision maker. Schommer also testified that he was present when Brown received the news of her termination, but that Stastny was the decision maker. (Doc. 29-5, at 17 p. 63).

On October 13, 2013, Brown met with Schommer and Kimball and Stastny, with Stastny participating by telephone. Stastny advised Brown that CRST was terminating her because of her boisterous and threatening behavior. Her termination documents state that the reason for her termination was "Misconduct Fighting and threatening violence on 10/7." (Doc. 29-19, at 11). During the meeting, Brown disagreed with the reason given for the termination, stating that the real reason the company was firing her was because she filed a complaint against Kimball.

9

Stastny replied that the complaint against Kimball was irrelevant.

CRST did not discipline Chekwa for the rock incident; he did receive an email prohibiting him from throwing rocks at work.

Although Golden testified that Kimball treated Brown differently than other employees, she also testified that Kimball did not treat Vershaune Roscoe, a black female, differently than other employees.  Roscoe confirmed that Kimball did not treat her differently than other employees.

On October 15, 2011, after her termination, Brown called Haffenden, who had held the position of Safety Director before Kimball, and left a voice message referencing her termination and asking if he could help her get her job back.  Haffenden called Schommer, who advised him that HR had conducted an investigation, made a determination, and Schommer would not support bringing Brown back.  Haffenden did not contact Kimball about Brown's termination.

Haffenden called Brown back on October 16, 2011, advising her that he was unaware that she had been terminated until after the fact; and he had not participated in the decision to fire her. According to Brown, Haffenden told her he had talked with HR and Schommer about rehiring her and "would try to get me my job back."  When Brown asked Haffenden what Kimball's problem was with her, Haffenden responded "it's because you're an independent black woman. Some may see it as an asset.  Others may see it as a threat."  (Brown Dep. Doc. 24-1, at 99-100). Haffenden denied making the "independent black woman" statement, does not recall discussing Kimball at all in his October 16 phone conversation with Brown, and testified that he did not know Kimball well enough to make a judgment about Kimball's motives.

On October 17, 2011, CRST hired two safety specialists, a white female and a black

female.

*Company policy*

Stastny testified that if an employee is found guilty of fighting or threatening violence in

the workplace, the employee is automatically terminated.

CRST's Office Employee Handbook listing Employment Policies and Practice includes

an EEO Policy Statement that the company provides equal employment opportunities; expressly

prohibits unlawful employee harassment based on race and sex, among other protected

characteristics; and provides a complaint procedure. That procedure encourages employees and

supervisors who become aware of prohibited discrimination to immediately notify an HR

representative, and it also requests that each complaint be put in writing so that it can receive

thorough investigation. The handbook also includes the following provisions.

DISCIPLINARY ACTION
***
Failure to abide by the rules, regulations and policies of the company may
justify disciplinary action, up to and including termination.

Disciplinary actions are generally progressive. The severity of the infractions
may justify immediate suspension or termination. The company reserves the
right to immediately terminate an employee if deemed appropriate or necessary
under the circumstances.

The following violations of company policy shall subject an employee to
disciplinary action. Violations are not limited to the following list.
***
•        Fighting or threatening violence in the workplace
•        Boisterous or disruptive activity in the workplace
***
VIOLENCE IN THE WORKPLACE
Nothing is more important to the company than the safety and security of its
employees. Threats, threatening behavior, or acts of violence against
employees, visitors, guests, or other individuals by any employee is prohibited.

11

Any person or employee who threatens (directly or indirectly), exhibits threatening behavior, or engages in violent behavior or that which is considered by the company as inappropriate while on company property shall be removed from company premises as quickly as safety permits, and shall remain off company premises pending the outcome of an investigation.  The company will initiate a decisive and appropriate response should the investigation substantiate that a violation of this policy (by letter or in spirit) has occurred.  This response may include, but is not limited to, suspension and/or termination of any business relationship, reassignment of job duties, suspension or termination or termination of employment and/or seeking arrest and prosecution of the person or persons involved.

All employees are responsible for notifying the Human Resources Director of any threat, perceived threats, act of violence or other inappropriate behavior that they have witnessed, received or have told of by another person.  All employees are responsible for making this report regardless of the nature of the relationship between the individual who initiated the threat or threatening behavior and the person or persons who were threatened or were the focus of threatening behavior.
***

(Doc. 24-3, at 9, 16, & 19).

Although CRST has two separate employee handbooks, one for drivers and another for office personnel, both handbooks have policies against fighting and threatening behavior. Stastny testified that fighting or threatening violence in the workplace is a terminable offense for both drivers and office personnel, as stated in both handbooks.  (Stastny Dep. 68, 72, & 374).

*EEOC Charge*

On March 6, 2014, Brown filed a Charge of Discrimination with the EEOC checking the boxes for discrimination based on race and sex, and retaliation.  In that charge, Brown refers to Kimball's treatment of her, calling her "Trouble" instead of her name, ignoring her when she came into his office, refusing to address her directly or take anything from her hand, and forcing her to enlist Golden to accompany her to talk to Kimball.  She states in the Charge that she

complained to Haffenden about how Kimball treated her, and complained to Golden that Kimball had a problem with black women.  She stated she also complained to Stastny and Oetken that she felt discriminated against based on race and gender, but they never addressed the issue and focused instead on the rock incident with Chekwa.  When the company terminated her, claiming the action was based on her behavior during the rock incident, she told Stastny that the real reason for her termination was her complaints against Kimball, a claim Stastny denied.

*Comparators*

Brown proffers evidence of  CRST white employees who were written up for boisterous behavior involving profanity, fighting and/or threats but whom CRST did not terminate for that behavior:   Mary Cooper—white female loudly referring to her workload as "this damn shit" and "this bullshit"; Roy Bowers—white male calling the fleet manager "a fucking idiot" and "fucking stupid"; Michael Dickerson—a white male whom a co-driver accused of playing offensive music and making threatening remarks; John Henderson—a white male accused of threatening the life of another employee; Travis Pruter—a white male accused of threatening violence; Richard Herob—a white male accused of fighting or threatening violence; Casey Crabtree—a white male accused of participating in a physical altercation; Ted Sams—a white male accused of being involved in a verbal altercation; Alan Kronjak—a white male accused of being involved in a verbal altercation; Virginia Paris—a white female accused of threats and sexual harassment; James Snead—a white male accused of getting in someone's face and threatening him; Michael Trapp—a white male who was accused of assault; Thomas Watkins—a white male accused of assault; Jefferey Jacobs—a white male who was accused of making physical threats.

As for the discipline that CRST meted out for precise behavior, CRST records provide a

13

code for employees leaving the company, explaining the reason for leaving.   The spreadsheet lists the terminations of Dickerson and Henderson as Code 28, which means they were terminated for failing to meet company standards, not misconduct.  The spreadsheet lists Herob and Pruter's termination as Code 7, which means they were terminated for failing to show up for work.  The spreadsheet lists the termination of Sams, Paris, Trapp, Watkins, Jacobs and Crabtree as voluntary.  Snead's termination was listed as Code 33, which means he abandoned his load. As the codes on the spreadsheets demonstrate, all of the white employees listed in the preceding paragraph were written up for threatening conduct but the codes reflect that none was terminated for that conduct.

Stastny testified that the company may or may not have an employee relations file on employees who were disciplined.  She also stated that she could not determine from the spreadsheet whether an investigation was required and conducted nor could she tell from the spreadsheets whether the drivers were independent contractors or employees.

CRST records do not reflect that any of these accusations were determined to be unfounded and further do not reflect the race of the employee in question, or that the person making the discipline decision knew their race.  At the time the report about these employees was generated, some of these employees still worked for CRST and some had been terminated or left voluntarily.

### III.  LEGAL STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a

14

district court reviews a motion for summary judgment it must determine two things: (1) whether

any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering

evidence showing no dispute of material fact or by showing that the non-moving party's evidence

fails to prove an essential element of its case on which it bears the ultimate burden of proof.

*Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support

its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine

issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that

there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats &*

*Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not

significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are

material and which are irrelevant.  *Id*. at 248.  In responding to a motion for summary judgment,

the non-moving party "must do more than simply show that there is some metaphysical doubt as

to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by

the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings."  *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."

16

*Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

## IV.  DISCUSSION

Brown's Complaint presents the following claims: Count One - Discriminatory Discipline based on Race and Gender, and Hostile Work Environment, all brought pursuant to Title VII; Count Two - Race Discrimination, and possibly Hostile Work Environment, brought pursuant to § 1981; and Count Three - Retaliation based on race brought pursuant to Title VII and § 1981, and Retaliation based on gender brought pursuant to Title VII.  The court will address these claims separately.

### A.  Race Discrimination

Brown asserts claims of race discrimination, or a combination of race and sex discrimination, based upon a disparate application of disciplinary rules, brought pursuant to both Title VII & § 1981.  Because the standards of proof and analytical elements are the same under both statutes, the court will analyze them concurrently under the same framework.  *See, e.g.,*

17

*Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (citing *Standard v. ABEL Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998)).   As Brown does not present direct evidence of discrimination, she relies upon the burden-shifting framework set out in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973) to present a case based on circumstantial evidence.

Under that framework, to establish a *prima facie* case for disparate treatment based on race in a disciplinary matter, a plaintiff must show that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler v. Orange Cnty., Fla.,* 447 F.3d 1319, 1323 (11th Cir. 2006).   CRST  challenges elements two and three.

### Element Two: Adverse Employment Action

CRST argues that Brown cannot establish an adverse employment action, stating "[a]part from her discharge, Ms. Brown only complains that Mr. Kimball ignored her or treated her rudely."  (Doc. 23, at 22).   That statement is akin to saying "apart from your husband's assassination, Mrs. Lincoln, did you enjoy the play?"  Brown's discharge is unquestionably an adverse employment action and any attempt to argue otherwise is not appropriate advocacy; the court FINDS that she has established element two of her *prima facie* case.

### Element Three: Similarly Situated Comparator

CRST also argues that Brown has failed to establish element three because she has not provided evidence of a similarly situated comparator.  When addressing the "similarly situated" element in a discriminatory discipline case, the court must evaluate "'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'"

*Burke-Fowler,* 447 F.3d at 1323 (quoting *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999) (citations and quotation marks omitted)).   The Eleventh Circuit has explained that the proffered comparator must be "similarly situated in all relevant respects."   *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997).   "The quantity and quality of the comparator's misconduct should be nearly identical." *Stone & Webster Const., Inc. v. U.S. Dep't of Labor,* 684 F.3d 1127, 1135 (11th Cir. 2012)[1].   The Court of Appeals also pointed to "[t]he most important factors in the disciplinary context[:] the nature of the offenses committed and the nature of the punishments imposed."   *Maniccia v. Brown,* 171 F.3d 1364 (11th Cir. 1999) (quotations and citations omitted).

As to similarly situated white comparators, Defendants argue that Brown has only presented one white comparator, Mary Cooper, and that Cooper is not similarly situated because she cursed but did not direct her cursing at another employee.   This argument perplexes the court because it mischaracterizes the evidence.

Brown has presented a number of potential white comparators, including white males and white females, who, she claims, were similarly situated to Brown in that company records in

---

[1] The court acknowledges Brown's argument that the "nearly identical" standard set forth in *Maniccia v. Brown,* 171 F.3d 1364 (11th Cir. 199) and *Burke-Fowler v. Orange Cnty., Fla.,* 447 F.3d 1319, 1323 n. 2 (11th Cir. 2006) should not govern, and Brown cites as support for her argument a district court opinion, *Terpo v. RBC Bank,* No. 12-2325-VEH, 2013 WL 5519704, *8 n. 17) N.D. Ala. Oct. 2, 2013).   However, the court rejects that argument, noting that, in 2012, the Eleventh Circuit addressed head-on in its *Stone & Webster* decision the argument against applying the "nearly identical" standard.   In that decision, the Court of Appeals stated that it had resolved that conflict in favor of the "nearly identical" standard, and had expressly set aside the case that did not rely on that standard.   In *Stone & Webster,* the Eleventh Circuit applied once again the "nearly identical" standard.   684 F.3d at 1135.   Given that clear direction, unless and until the Eleventh Circuit specifically advises this court to apply another standard, the court will apply the "nearly identical" standard.

CRST Employee Relations Spreadsheets reflect that they threatened other employees with physical violence on at least one occasion.  Stastny, whom CRST now identifies as *the* decision maker, explained that the primary reason CRST terminated Brown was her threatening behavior on one occasion—her threat that the Recruiting Supervisor better get Chekwa away from her "or I'm gonna put my foot up his ass"—a statement Stastny interpreted as one for physical violence.  Although profanity accompanied Brown's behavior, Stastny's testimony about the primary reason for the termination is consistent with the Human Resources Change Notice documenting Brown's termination, which lists the reason for the termination as "Misconduct Fighting and threatening violence on 10/7."  The termination notice does not mention the profanity.

The CRST Employee Relations Spreadsheets reflect that the proffered comparators threatened other employees with physical violence on at least one occasion.   For example, the spreadsheet entry on Henderson reflects that he "threatened Martinez' [sic] life"; Pruter's entry reflects that he was written up for a "Threat of violence"; and the entry on Jacobs says he made "physical threats."  The court finds these comparators who made physical threats to be "nearly identical" within the meaning of the term.   Because Brown is a 115-pound woman and Chekwa is a much larger man, the threat—to "put her foot up his ass"—is not one where the person threatened was reasonably in fear of bodily harm.  Therefore, in analyzing similarly situated comparators, the court focuses only on the fact of a threat of violence.

The court finds disingenuous CRST's argument that the information in the Employee Relations spreadsheets listing employee disciplinary matters is not evidence that Brown can appropriately rely upon for the purposes of summary judgment.  Stastny testified that the primary reason for the termination was Brown's threats to Chekwa, a threat she interpreted as one for

physical violence. CRST argues that the spreadsheet information is "informal" for internal use by HR and that it does not give enough specific information about each disciplinary matter to establish that the matters on the spreadsheet are nearly identical to the disciplinary matter in the instant case.  CRST further argues that the company may have determined, after investigation, that some of the matters on the spreadsheet represented unfounded accusations of misconduct.

The court disagrees with CRST's argument that the spreadsheet is not evidence sufficiently establishing comparator misconduct at the summary judgment stage.  CRST is the entity doing the documenting.  CRST provided enough documentation to present a list of employees with nearly identical behavior (threats) with a dissimilar outcome (no resulting termination).  If CRST had *further* information about the results of the internal investigation of the threats that would show the incidents were *not* nearly identical, then it should have provided that information in discovery and presented that information at summary judgment.  In addition, if CRST had information to show that employees listed on the spreadsheet were African American and were not terminated for misconduct similar to that of Brown, it had an opportunity to present that evidence during discovery and to the court at summary judgment, but the briefs' Statements of Fact do not include such information. Brown has presented to the court enough evidence to establish her *prima facie* case based on a number of white employees and/or employees who were not black females who were written up for threatening behavior but who were not terminated.

That said, the court agrees with CRST that Mary Cooper is not a similarly situated comparator.  Stastny testified that the primary reason for the termination was Brown's threats to Chekwa, a threat she interpreted as one for physical violence.  Accordingly, the white employees

21

reported to HR as threatening physical violence at CRST but who were not terminated would represent similarly situated comparators based on what is before the court at this summary judgment stage.  Cooper and Roy Bowers, another white comparator, cursed but did not threaten; thus, they and the white employees who did not commit nearly identical behavior are not appropriate comparators.   However, Brown meets her *prima facie* case by presenting other similarly situated comparators who were white and/or who were not black females, and who threatened co-workers with physical violence but were not terminated.

As to *male* comparators, the court notes that a number of the comparators listed above who exhibited threatening behavior were male, and it FINDS that Brown has met her *prima facie* case by presenting similarly situated male comparators.

Because Brown has established her *prima facie* case on the discriminatory discipline claim, CRST must articulate a non-discriminatory reason for firing Brown.  *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 (1993).  In its briefs, CRST argues that Brown has not established her *prima facie* case, and does not provide an alternative argument regarding pretext; therefore, CRST gives a non-discriminatory reason for the termination—Brown's conduct of threatening violence—but it does not give a non-discriminatory reason for disciplining her *differently* than other employees who threatened violence. In other words, it gives a non-discriminatory reason for terminating her but that reason fails to explain why it terminated Brown *but not others who engaged in the same behavior*.  In any event, to the extent, if any, that CRST has met its burden to articulate a legitimate, non-discriminatory reason for the termination, the court FINDS that Brown has met that reason head on and shown pretext for the reasons discussed below.

22

To show pretext, a plaintiff must demonstrate that the employer's "proffered reason was not the true reason for the employment decision." *Texas Dep't of Cmty. Affairs. v. Burdine,* 450 U.S. 248, 256 (1981). She must "confront the employer's seemingly legitimate reason for [the adverse employment action ] 'head on and rebut it.'" *Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1206 (11th Cir. 2013). To do so, she must "cast sufficient doubt on the defendant's proffered ... reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)). She can do that by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs,* 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3rd. Cir. 1996)). However, a plaintiff "'cannot succeed by simply quarreling with the wisdom of that reason ....'" *Kidd,* 731 F.3d at 1206 (quoting *Chapman v. AI Tranport,* 229 F.3d 1012, 1030 (11th Cir. 2000)); *see Alexander v. Fulton Cnty., Ga.,* 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not [] motivated [by discrimination or retaliation]").

In the instant case, Brown has presented evidence of inconsistencies in disciplining Brown versus  white employees, male employees, and employees who are not black females who exhibited the same behavior. She also argues that the harsh discipline of termination makes no sense when no one could reasonably characterize her words to Chekwa as a true threat of violence. Rather, her words about sticking her "foot up [Chekwa's] ass" represented an empty

figure of speech instead of a serious threat, particularly given that she was a petite girl and Chekwa was 200 pounds and over six feet tall.  Thus, Brown has cast sufficient doubt on the non-discriminatory reason to establish a genuine issue of material fact that the reason for her termination was pretext for discrimination. The court notes that CRST has provided evidence that Kimball and safety and recruiting department employees were frustrated at Brown for doing her job well and strictly adhering to company hiring guidelines, as further discussed below. However, that evidence would not explain why the decision makers, Stastny and/or or Schommer, treated Brown differently.  Accordingly, the court FINDS that the motion for summary judgment is due to be DENIED as to the claim for discriminatory discipline in Count One.

Because the standards of proof and analytical elements are the same under Title VII and § 1981, the court also FINDS that the motion for summary judgment is due to be DENIED as to the claim for discriminatory discipline in Count Two brought pursuant to § 1981.

**B. Hostile Work Environment**

Brown also alleges in Count One that she "has been discriminated and harassed because of her gender and has further been subjected to unequal treatment, terms and pay thus subjecting Plaintiff to a hostile work environment because of her gender." (Compl. doc. 1, at 7).  In her brief, Brown characterizes the work environment as a hostile one based on race and gender.  She points to evidence of Kimball's treatment as supporting a hostile work environment.  As discussed previously, Brown provides evidence that Kimball addressed Brown as "Trouble," instead of her name, but acknowledges that she saw no racial or gender connotations in that moniker.   In addition, Brown provides evidence  that, after she questioned Kimball's hiring a

24

driver as outside the hiring guidelines, Kimball began ignoring her and stopped communicating with Brown directly, using Golden, a white female, as an intermediary.  Brown also provided evidence that Kimball's refusal to deal with her was so complete and disruptive to work communication that Brown asked Golden to accompany her to Kimball's office when Brown needed to communicate with him.   She provided further evidence that Kimball was the employee who lodged the complaint about the incident between Brown and Chekwa that led to her termination.

To establish a *prima facie* case of hostile work environment, brought pursuant to Title VII, a plaintiff must show

> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

In the instant case, CRST challenges elements three and four, arguing that no evidence ties the harassment to race and sex and that the harassment was not sufficiently severe or pervasive.

*Element Three: Harassment Based on Race and Gender*

As to element three, CRST argues that although the evidence reflects Kimball did treat Brown differently than other employees, it also reflects that the difference in treatment was not based on race or gender.  In support of its argument, CRST points to evidence that (1) Kimball treated another black female with whom he worked daily, Vershaune Roscoe, no differently than

he treated the white employees; (2) Kimball treated Golden, a female, no differently than he treated male employees; and (3) that the deterioration of Kimball's relationship with Brown occurred about the time she called him out on hiring a driver outside company hiring guidelines. Brown's own email to HR complaining of Kimball's treatment mentions and *implies a link with the hiring guideline incident but does not mention race or gender discrimination*.  In fact, that email includes the statement that Kimball treated Brown differently than *everyone* else in the department.  Because the department included another black female, this statement that Brown is the only one he treated differently is very significant.

Further, in her interview with Stastny, Brown does use the words "discrimination" and "retaliation" but the context of those words is important: a careful reading shows that she is complaining of unfair treatment *not* because of race or gender but because her co-workers are mad at her for making them adhere to company hiring guidelines.  As she explained to Stastny: "I feel discriminated against.  I feel like I'm under attack for something that I did not do or I felt the need to protect myself, and I then told her, I said I feel like I'm being retaliated against because I do my job very well and they have the – they have an issue with me because they can't go against the guidelines."  Thus, when placed in context, her complaints point to a reason for differential treatment that has *nothing to do with race and gender*.

Title VII and § 1981 do not protect against *all* differential treatment in the employment context.  They certainly do not protect against differential treatment based on co-worker frustration at being held to strict hiring guidelines.  Rather, they only protect against *unlawful* differential treatment such as treatment based on race and/or gender.  Brown's use of the words "discrimination" and "retaliation" does not automatically invoke protection under Title VII: she

26

must provide some more information indicating  that the discrimination and retaliation is
*unlawful*.  *See* 42 U.S.C. § 2000e-2(a)(1) (stating "It shall be an unlawful employment practice
for an employer ... to discharge any individual, or otherwise to discriminate against any
individual ... *because of such individual's race, color, religion, sex, or national origin* ....")
(emphasis added); 42 U.S.C. § 2003-3(a) (providing that "It shall be an unlawful employment
practice for an employer to discriminate against any of his employees ... *because* [the employee]
has opposed any practice made an unlawful employment practice by this title. . . .") (emphasis
added).

        The only evidence that Brown offers as tying her different treatment to race and gender is
(1) Kimball's favorable treatment of Golden, a white woman, and Kimball's better treatment of
Brown when Golden accompanied her to Kimball's office; and (2) Vice President Haffenden's
response to Brown's question, after her termination, about why Kimball had a problem with her:
"it's because you're an independent black woman.  Some may see it as an asset.  Others may see
it as a threat."

        As to the different treatment of Brown versus Golden, that treatment is consistent with
the non-discriminatory reason presented for Kimball's treatment, because no evidence exists that
Golden made Kimball mad by advising him that he had hired a driver outside the company hiring
guidelines.  Further, because no evidence exists that Kimball treated Roscoe, the other black
woman in his department, differently than white or male employees, any assumption that
Kimball's differential treatment of Brown was based on race and gender is not a reasonable one.

        As to Haffenden's "independent black woman" response, whether Haffenden made this
statement is a disputed fact.  However, taking the facts in the light most favorable to Brown, the

court must assume for the purposes of summary judgment that Haffenden did make the statement.  Nevertheless, that assumption does not mean that the court must accept that statement as admissible evidence of a link between Kimball's treatment of Brown and discrimination based on race and gender.  The evidence reflects that Haffenden, the former safety director, and Kimball, who took his place, only had a two-week overlap in the Trussville office before the relationship between Brown and Kimball deteriorated. No evidence exists that Brown communicated Kimball's maltreatment of her during that period or that Haffenden personally witnessed Kimball's differential treatment of Brown, or indeed, differential treatment of any black female employee, black employee, or female employee.   No evidence exists that Haffenden heard Kimball say any words indicating a bias against black women, blacks, or females.  Notably, Haffenden did not participate in the harassment of Brown, did not discuss the harassment of Brown or her termination with Kimball, was not involved in the termination of Brown, was not aware of the termination until after it had occurred, and did not discuss the termination with Kimball after the fact.  Further, no evidence exists that Haffenden and Schommer discussed Kimball during their October phone conversation.

On motions for summary judgment, the court may consider only evidence that "can be reduced to an admissible form."  *Rowell v. BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir. 2005). Under these circumstances, any statement that Haffenden may have made about Kimball's motives for harassment and differential treatment of Brown would not be reducible to admissible form; it was a mere inadmissible opinion of a person who did not participate in the harassment, personally witness it, or discuss the harassment with the harasser. *See Rowell,* 433 F.3d at 800 (affirming grant of summary judgment in favor of the employer in a discrimination suit when the

28

alleged dispute of fact regarding the employment decision was the inadmissible personal opinion of defendant's employee about the decision and when that employee did not participate in the decision or policy);  *Williams v. Hager Hinge Co.,* 916 F. Supp. 1163, 1168 (M.D. Ala. 1995) ("[b]ald conclusions, opinions, and hearsay without supporting specific facts are not admissible and do not create a genuine issue of material fact") (citing  *Evers v. Gen. Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985)); *see also Kidd ,* 731 F.3d at 1209-1211 (remanding the case to the district court that granted motion for summary judgment to make a ruling on the admissibility of the declarant's statement regarding the employer's decision making process, but acknowledging that if the declarant did not participate in the decision making process, his opinion of the employment decision is inadmissible and summary judgment would be appropriate).

Because Haffenden's response is the only link with race and gender and because that response is inadmissible opinion, the court FINDS that Haffenden's response does not create a genuine issue of material fact that Kimball's harassment of Brown was based on race and/or gender.  In light of this ruling, the court need not and does not address any other elements of Brown's *prima facie case* or the pretext argument. Accordingly, the motion for summary judgment is due to be GRANTED as to the claim for hostile work environment based on race and/or gender brought pursuant to Title VII in Count One, and as to the claim for hostile work environment based on race brought pursuant to § 1981 in Count Two, to the extent that claim exists.

### C. Count Three:  Retaliatory Termination Under Title VII and § 1981

In Count Three, Brown asserts that her termination was in retaliation for complaining about Kimball's harassment of her.

29

To establish a *prima facie* case of retaliation, a plaintiff must show "(1) that she engaged in an activity protected under Title VII; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action."  *Kidd,* 731 F.3d at 1211.  If the plaintiff establishes her *prima facie* case, the employer must articulate a legitimate, nonretaliatory reason for the challenged action, and, if it does so, then plaintiff has the burden to establish that the employer's proffered reason for that action was pretext for retaliation. *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001).

In the instant case, CRST challenges elements one and three.

*Element One: Protected Activity*

Brown argues that she engaged in two incidences of protected activity before her termination: her October 10 email to Stastny; and her October 12 meeting with Stastny and Oetken.  As discussed previously, Brown's October 10 email complained of differential treatment but tied that treatment to Brown's adherence to hiring guidelines instead of race and/or gender discrimination.  Further, Brown used the words "discrimination" and "retaliation" in her October 12 meeting but, again, did not complain of *unlawful* discrimination and retaliation based on race or gender. As discussed, she tied the differential treatment to her adherence to hiring guidelines, not to her race and/or gender.

Recent decisions of the Eleventh Circuit, although unpublished, have provided instruction on the level of specificity needed in the alleged protected conduct to ensure  that it qualifies under Title VII's opposition clause.  In *Brown v. City of Opelika,* the Eleventh Circuit addressed a district court's grant of summary judgment in favor of the employer on a Title VII retaliation claim.  At the district court level, the employee had asserted that she engaged in protected

conduct when she stated to a superior that she "wanted to make a complaint of 'harassment.'"
No. 05-CV-236-W, 2006 WL 1515836, *4 (M.D. Ala. May 30, 2006).  In affirming, the Court of
Appeals explained that "the record contained no evidence that Brown engaged in a protected
activity by making a complaint about racial discrimination or harassment. . . . Brown admitted
that she never mentioned the word 'race' when she complained about Kirby's behavior, that she
had no knowledge of Kirby making any racially derogatory comments, and that Kirby took out
her anger on everyone, including the white office assistant."  Further, the employee "never
voiced a complaint that the City was engaged in an *unlawful* employment practice."  211 Fed.
Appx. 862, 863-4 (11th Cir. 2006) (per curiam) (emphasis added).

     In *Jeronimus v. Polk Cnty. Opportunity Council,* the Eleventh Circuit affirmed the
district court's grant of summary judgment in favor of the employer, finding that the emails
plaintiff sent—one casually mentioning a "white boy" comment and another complaining that he
was being "'singled out,' was subjected to 'a campaign of harassment,' and was working in a
'hostile environment'"—did not constitute protected activity.  The Court of Appeals explained
that the "'white boy' comments were isolated, ephemeral, and ambiguous" and that in plaintiff's
other complaints "he never suggested that this treatment was in any way related to his race or
sex.'"  145 Fed. Appx. 319, 326 (11th Cir. 2005) (per curiam).

     Applying these decisions and their instruction regarding protected conduct, the court
FINDS that Brown's communications of October 10 and 12 do not constitute protected conduct
because she never suggested that Kimball's treatment was in any way related to her race and/or
gender.

     Because Brown has not established that she engaged in protected conduct before her

termination, she has failed to meet element one of her *prima facie* case of retaliation,  and the

motion for summary judgment is due to be GRANTED as to the retaliation claim brought

pursuant to Title VII and § 1981.

*Element Three: Causal Connection*

CRST also challenges Brown's proof of a causal connection between the protected

conduct and her termination.  Because of the court's ruling on protected conduct element, the

court need not address other elements.  However, in an abundance of caution, the court addresses

the causal connection element to provide the following ruling as an *alternative* means of granting

summary judgment on the retaliation claim.

In the recent decision of *Univ. of Tex. SW Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct.

2517 (2013), the Supreme Court held that "a plaintiff making a retaliation claim under § 2000e-

3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse

action by the employer." *Id.* at 2534.   *Nassar* was a Title VII case, and thus, the "but-for"

standard of causation would apply to the Title VII claim of retaliation.  Brown also asserts a

claim for retaliation under § 1981, and, as noted previously, the Eleventh Circuit has explained

that the analysis for  Title VII and § 1981 retaliation claims are the same.  *See Goldsmith v.*

*Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).  Although the *Goldsmith* decision

occurred before the *Nassar* decision, the Supreme Court's reasoning in *Nassar* would favor

application of the "but-for" standard to the § 1981retaliation claim as well.  The Court explained

that "absent an indication to the contrary in the statute itself," but-for causation is "the default

rule[ ]" that Congress is presumed to incorporate into a statute creating an intentional tort unless

Congress specifies another causation standard, as it did in Title VII's § 2000e-2(m) but not in its

anti-retaliation provision of § 2000e-3(a).

With this guidance in mind, the court applies the "but-for" causation standard to Brown's retaliation claim under § 1981 as well as the Title VII retaliation claim.  This application is consistent with decisions of district courts in the Eleventh Circuit that have addressed § 1981 claims after *Nassar.  See, e.g., Shumate v. Selma City Bd. of Educ.,* No. 11-00078-CG, 2013 WL 5758699, at *2-3 (S.D. Ala. Oct. 24, 2013); *Parker v. Chilton Cnty. Bd. of Educ.,* No. 12-0650-MEF, 2014 WL 116341 (M.D. Ala. Jan. 13, 2014).

CRST argues that Brown's misconduct of threatening and boisterous conduct occurred *before* the protected conduct, and that CRST had already begun its investigation into her misconduct when she engaged in the alleged protected conduct.  CRST further points the court to the unreported decision of *Smith v. Hyundai Motor Mfg. Ala., LLC,* No. 06-966-ID, 2008 WL 1698207 (M.D. Ala.  Apr. 9, 2008) in which a sister district court granted the employer's motion for summary judgment under similar circumstances in a retaliation case; the employee's misconduct resulting in termination occurred *before* the protected conduct "but also the wheels for Plaintiff's termination already had been set in motion by the time Plaintiff made his internal complaint.  The court found that the company "was not expected to halt or forego its disciplinary proceedings imply because, on the heels of [the company's] contemplated termination of Plaintiff, Plaintiff screamed retaliation." *Id.* at 12.

In the instant case, the court FINDS, as an alternative ruling, that Brown cannot show her statements about "discrimination" and "retaliation" in the period of October 10-12, 2011 were the "but-for" reason for her termination.  Her complaints *occurred after* the investigation had begun into her alleged misconduct on October 7 and after the company had obtained

investigative statements from the other witnesses.  Like the fact scenario in *Smith*, the wheels for her discipline had already been set in motion by the time Brown made her ambiguous assertions that she now characterizes as protected conduct.  As the Supreme Court of the United States explained in *Clark County School District v. Breeden,* "[e]mployers need not suspend previously planned [discipline] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  532 U.S. 268, 272 (2001).  Even assuming *arguendo* that Brown's statements during the period of October 10-12, 2011 constitute protected conduct—and the court does not hold that they do—she has not established evidence of causality, and she most certainly has not established the but-for causality required for a *prima facie* case of retaliation.

For all of these reasons, the court FINDS that the motion for summary judgment is due to be GRANTED as to Brown's claims for retaliation, brought pursuant to Title VII and § 1981.

## V.  CONCLUSION

For the reasons stated below, the court FINDS that CRST's motion for summary judgment is due to be GRANTED in PART and DENIED in PART.  More specifically, the court FINDS

- the motion is due to be DENIED as to the claims in Count One for discrimination based race and/or gender, brought pursuant to Title VII;

- the motion is due to be GRANTED as to the claims in Count One for hostile work environment based on race and/or gender, brought pursuant to Title VII;

- the motion is due to be DENIED as to the claims in Count Two for discrimination based on race, brought pursuant to § 1981;

34

- the motion is due to be GRANTED as to the claims in Count Two for hostile work environment based on race, brought pursuant to § 1981;

- the motion is due to be GRANTED as to the claims for retaliation brought pursuant to Title VII and § 1981.

The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 17th day of August, 2014.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

35